UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EMILY A. GROFF,

    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C08-5058RJB-KLS

REPORT AND RECOMMENDATION

Noted for October 17, 2008

Plaintiff, Emily A. Groff, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Robert J. Bryan's review.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 32 years old.[1] Tr. 71. She has two years of college education and past work experience as a sandwich artist, cashier and library page. Tr. 36, 66, 194.

On April 8, 2005, and April 18, 2005, plaintiff filed an application for SSI benefits and an

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

application for disability insurance benefits respectively, alleging disability as of January 1, 2004, due to type II bipolar disorder and depression. Tr. 14, 104, 188. Her applications were denied initially and on reconsideration. Tr. 14, 71, 74, 80, 83. A hearing was held before an administrative law judge ("ALJ") on March 14, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 24-70.

On April 10, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2) at step two, plaintiff had "severe" impairments consisting of a personality disorder and a mood disorder;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4) at step four, plaintiff had the residual functional capacity to perform simple, routine tasks with only occasional public contact, which did not preclude her from performing her past relevant work.

Tr. 14-23. Plaintiff's request for review was denied by the Appeals Council on December 18, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 3; 20 C.F.R. § 404.981, § 416.1481.

On January 31, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on April 23, 2008. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a) the ALJ erred in evaluating the medical evidence in the record;

(b) the ALJ erred in assessing plaintiff's credibility;

(c) the ALJ erred in evaluating the lay witness evidence in the record;

(d) the ALJ erred in assessing plaintiff's residual functional capacity; and

(e) the ALJ erred in finding plaintiff capable of performing her past relevant work.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.   The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.  Dr. Brown

Plaintiff was evaluated by Norma L. Brown, Ph.D., on three different occasions. In the first such evaluation, completed in early April 2005, Dr. Brown assessed plaintiff with a severe bipolar II disorder resulting in a severe limitation in her ability to exercise judgment and make decisions and respond appropriately to and tolerate the pressure and expectations of a normal work setting. Tr. 351-52. Dr. Brown also found plaintiff to be markedly limited in her ability to care for herself. Tr. 352. Dr. Brown felt mental health intervention was likely to restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner, but also stated her mood swings needed to be stabilized and her suicidal ideation decreased. Tr. 353. Dr. Brown further estimated that plaintiff would be limited to the extent noted above for at least 12 months. Id.

In late February 2006, in addition to the severe and marked limitations set forth above, Dr. Brown also found plaintiff to be markedly limited in her ability to relate appropriately to co-workers and

supervisors and moderately limited in her ability to control physical or motor movements and maintain appropriate behavior. Tr. 305. This time, furthermore, Dr. Brown felt it was unknown whether mental health intervention would restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner, though she did feel plaintiff was "[s]eriously in need" of mental health counseling, and again estimated plaintiff would be limited as described above for at least 12 months. Tr. 306.

In early January 2007, Dr. Brown added the diagnosis of a personality disorder. Tr. 291. Unlike in her prior evaluations, this time Dr. Brown did not find plaintiff to be impaired in her ability to exercise judgment and make decisions. Tr. 292. However, she did deem plaintiff to be severely limited in her ability to relate appropriately to co-workers and supervisors and to respond appropriately to and tolerate the pressures and expectations of a normal work setting, markedly limited in her ability to interact appropriately in public contacts, control her physical or motor movements and maintain appropriate behavior, and moderately limited in her ability to care for herself. Id. Dr. Brown stated that plaintiff had chronic mental health instability, that mental health intervention would not likely restore or substantially improve her ability to work for pay in a regular and predictable manner, and, once more, that she would be limited to the above extent for at least 12 months. Tr. 293.

The ALJ assessed Dr. Brown's findings as follows:

> Dr. Brown is not a treating provider, she has evaluated the claimant repeatedly for DSHS [Washington State Department of Social and Health Services], but she has stated that the claimant has significant problems getting along with others and that she could not work with others or deal with stress, but the claimant is able to perform in public and has worked with a trio for singing, practicing every other week for more than a year. The claimant has demonstrated that she is not as limited as Dr. Brown indicated. . . .

Tr. 22. Plaintiff argues these reasons for rejecting Dr. Brown's findings are not supported by substantial evidence in the record. The undersigned agrees. First, as pointed out by plaintiff, the fact that Dr. Brown is not a treating provider, does not in this case necessarily detract from the findings she gleaned from her three evaluations of plaintiff, as the ALJ has pointed to no treating psychiatrist or psychologist findings or opinion in the record that contradicts Dr. Brown's findings.

The ALJ's statement that plaintiff's ability to perform in public and her work as part of a singing trio practicing every other week for more than a year, contradicts Dr. Brown's opinion that plaintiff has

significant problems getting along others and that she could not work with others or deal with stress, does not have substantial evidentiary support in the record. With her applications for benefits, plaintiff reported that she went to a coffee shop one to two times a week and to music events on a monthly basis, but did not indicate the extent of social interaction she had in those situations. Tr. 184. However, she did report that she avoided strangers and acquaintances "as much as possible," and that she would not "make any social contact at all unless someone prods/drags" her to do so. Tr. 185.

At the hearing, plaintiff testified that the last time she "had a paying gig" with her trio was six months ago, and that they will have a gig, which may or may not be paying, "[o]nce every few months." Tr. 40, 59. She testified that "[i]n theory" her trio wanted to practice "once a week," but the frequency usually was more like once every two or three weeks in part because she had "trouble keeping up with that pace of a schedule," and that practices were cancelled 20% of the time because she would not feel well enough to show up. Tr. 40, 61. In addition, in terms of "open mike" nights – where people come and sign up for a chance to sing – plaintiff testified that this was something that happened "once a month," and for which she had "a team" because she could not "carry it on" her own, and "[s]o every four months or so" she would "manage the open mike." Tr. 59-61.

Plaintiff's mother reported that plaintiff was "[r]eluctant to engage socially with people" she did not know or with people she did know in large groups, that she got "anxious at social events – even very casual ones," and that she hated "to be on her own in a crowd," although she apparently would go to have coffee with two or three other people up to "a few times a week," friends' houses one to two times a week and "open mic – once a month." Tr. 107, 109, 159. In terms of other activities plaintiff has performed in public, a social worker in late February 2007, noted that she "worked sporadically as a volunteer" in a food bank two hours a week during the last year, that she dropped "out periodically because of depression" and that she had not been seen "in the last few months." Tr. 112.

There is some evidence in the record that may indicate plaintiff's involvement in these activities is not as limited as the above reports and testimony might indicate. For example, Donna L. Poole, A.R.N.P., plaintiff's mental health treatment provider, noted that she reported in late April 2005, "occasional gigs." Tr. 320. In early January 2006, plaintiff reported that she had been "spending her time in volunteer work" and "performing with an a capella trio." Tr. 213. In early June 2006, she reported having been involved in

REPORT AND RECOMMENDATION
Page - 6

"social activities . . . that went well without anxiety." Tr. 232. In mid-July 2006, plaintiff reported that she was "active with an acapella [sic] group," and that they were "cutting a CD." Tr. 210.

In early September 2006, plaintiff reported that she was continuing "to organize and facilitate 'open mic nights,'" and that she had "been singing more often with her trio group." Tr. 230. In early December 2006, she again reported "doing some volunteer work and occasionally things with her a cappella group." Tr. 209. This evidence does indicate plaintiff's social activities and participation therein may have been at a level greater than that indicated by her own reports and testimony and the reports of her mother. On the other hand, it is not at all clear how much more often she may have been engaged with volunteer work or with her singing trio or in other "social activities" in general. As such, the record also does not clearly support the ALJ's findings here. Accordingly, remand for further consideration of this issue and of Dr. Brown's findings is appropriate.

B.  Dr. Kelly

Plaintiff was evaluated in mid-May 2005, by William Kelly, M.D., who diagnosed her with a recurrent major depressive disorder, borderline personality disorder, and global assessment of functioning ("GAF") score of "approximately 55." Tr. 331. He opined that she "should be able to perform detailed and complex tasks on a consistent basis," but "might have some difficulty getting along with supervisors or colleagues based on her previous history." Id. In addition, Dr. Brown opined that "[b]ased on her current presentation, it is unlikely that she would be able to complete a normal workday or workweek without interruption from a psychiatric condition" or "deal with the usual stress encountered in a competitive workplace." Id. He did conclude, however, that "with more aggressive psychiatric and psychologic treatment," plaintiff "might well be able to perform work activities on a consistent basis within the next 1-2 years." Tr. 332.

In regard to Dr. Kelly's opinion, the ALJ found that as with Dr. Brown:

> . . . Dr. Kelly did not think that the claimant could sustain activity without significant therapy. First, I note that the claimant has had significant therapy since she saw Dr. Kelly. Additionally, Dr. Kelly did not seem to be aware of the level of the claimant's activity. The claimant has managed to do some work activity and she has sustained relationships over a long period of time. She has stayed with therapy and followed through with treatment. Her treatment provider feels she is stable.

Tr. 22. Plaintiff again argues these reasons are not sufficient for rejecting the opinion of Dr. Kelly. The undersigned disagrees. Plaintiff asserts her work activities were sporadic and poorly performed, and thus

REPORT AND RECOMMENDATION
Page - 7

do not undermine Dr. Kelly's opinion. It is true that the record does not show plaintiff's work record to be as supportive of the above findings as the ALJ would make it out to be.

At the hearing, plaintiff testified that she was "working very intermittently once or twice a month" for her parents at their business and for her friend for the parks and recreation district. Tr. 41. She further testified that her last full-time job was working for her parents, but that – despite having also reported to Ms. Poole that she "found that a tedious isolating computer job" – she quit doing it because she would sleep in and show up late, leave "piles of work undone," surf the Internet, go take a nap "in the middle of the day," and because she "started to feel suicidal." Tr. 41-42, 50, 320. At the part-time job she held as a library page prior thereto, plaintiff testified that she was not consistent in showing up, missed more days than for which she had vacation or sick time, was reprimanded for her absences, and, after she left that job, was told that she would not be re-hired there. Tr. 51, 61-62.

In terms of the work plaintiff did for her friend, plaintiff testified that the job involved helping out with running music events "every now and then, maybe once a month or so" by putting up posters, but that she would forget her work commitments and the dates she was supposed to help out, and then not show up for work because she could not get herself to do it. Tr. 63. Her friend reported that plaintiff had "forgotten enough work commitments such that" she could not "rely on her to cover a shift without . . . someone else on hand," and that sometimes she did not show up for work and did not always "follow through with things." Tr. 125-26. Thus, while plaintiff had engaged in some work activity as found by the ALJ, her engagement therein or follow-through was not particularly consistent or dependable.

In terms of being able to sustain relationships over a long period of time, it is true that plaintiff has done so with family and a few friends, such as her singing trio. Even here, however, she appears to have had problems interacting with them due to anger or irritability, although medication may have helped with that. See Tr. 109, 159, 185. In any event, plaintiff's primary problems with social functioning, as noted above, seem to have concerned interacting with those she did not know very well or in situations which involved larger groups of people. Also as noted above, there is some evidence that more recently she may have been increasing her involvement in social activities. Nevertheless, as with her engagement in social activities in general discussed above, it is not clear the extent to which plaintiff may have increased her participation in larger groups or her interaction with people she does not know.

REPORT AND RECOMMENDATION
Page - 8

Plaintiff takes issue with the ALJ's emphasis on the fact that Dr. Kelly indicated she could improve with significant mental health treatment, that she had engaged in such treatment, and that she was felt to be stable by her treatment provider. It is true that the mere fact that a claimant is noted to be stable, does not alone mean his or her mental health condition has improved. Plaintiff's treatment notes, however, do show that she did see significant improvement in this area over time. While plaintiff's depression was noted to be "uncontrolled" and that Zoloft was "not managing her symptoms adequately" in early and mid-April 2005, respectively, later that month she reported noticing "improvement in depression" since starting that medication. Tr. 325, 334, 339. Ms. Poole also noted in late may, 2005, that she "had a very good response to her medications," although she was "not quite stable." Tr. 317.

Plaintiff reported "trying new meds with mixed results" in early May 2005 (Tr. 198), but reported in late July 2005, that although her "cycles" were "becoming more and more rapid," they were "less and less extreme" (Tr. 244). Ms. Poole also commented at that time that plaintiff continued "to do quite well" on Lamictal, and that she was "tolerating it well without side effects." Tr. 216. While plaintiff appeared to have some increase in symptoms through mid-September 2005 (Tr. 215, 242-43), she reported "toleration of, and fair efficacy of her medication regime" in early January 2006 (Tr. 213). Although she also reported having "some feelings of depression" at the time, she was "completely free of suicidal ideation," and Ms. Poole found her to be "relatively stable on her current medication regimen." Id. Plaintiff did report difficulties with her medications in mid-March 2006 (Tr. 115), and Ms. Poole stated later that month that plaintiff's borderline personality disorder "probably" interfered "with her ability to maintain employment or relationships," and that her depression was "often immobilizing" (Tr. 211).

By early April 2006, however, improvement in plaintiff's mood and affect were noted to be bright, and she reported "a desire for more social contacts and an enhanced social network." Tr. 237. Though her level of depression remained somewhat high in mid-May and early June 2006, plaintiff rated her anxiety as a two on a scale of ten, with zero being none. Tr. 232, 234. In mid-July 2006, although plaintiff did report experiencing "one episode of mood disturbance" lasting for three days, "followed by a week-long crash," this was the only time such an episode had occurred since at least March 2006, and Ms. Poole noted that "[f]or the most part," she was "doing quite well on her current medication regimen." Tr. 210. In early September 2006, plaintiff again reported "a 2 for her anxiety and a 4 for depression" (Tr. 230), and in early

1  October 2006, she rated both her depressive and anxiety symptoms as being a zero (Tr. 229). Indeed, at
2  that time plaintiff "agreed that all treatment goals had been met." Tr. 229.
3        In early December 2006, plaintiff again reported that she was tolerating her medication regimen,
4  that it was efficacious, and that she was "feeling fairly stable," with Ms. Poole also commenting that she
5  remained "relatively stable on her current medication regimen." Tr. 209. Thus, while, as noted above, a
6  mere report of stability alone does not demonstrate medical improvement, here, the evidence in the record
7  does show such improvement over time, and particularly more recently. Indeed, as just mentioned, most
8  recently, plaintiff agreed that all of her treatment goals had been met, with both her and Ms. Poole noting
9  continued stability thereafter, at least as of December 2006.
10        Given that Dr. Kelly opined back in mid-May 2005, that plaintiff "might well be able to perform
11  work activities on a consistent basis within the next 1-2 years" with mental health treatment, and that some
12  one and a half years later, both plaintiff and her mental health treatment provider agreed that she had meet
13  all treatment goals, it was not unreasonable to discount Dr. Kelly's opined work limitations on this basis.
14  In addition, as plaintiff herself asserts, the opinions of Dr. Kelly and Dr. Brown regarding plaintiff's work-
15  related limitations are consistent in many ways with each other. Thus, the ALJ's proper discrediting of Dr.
16  Kelly's opinion also calls into question the opinions of Dr. Brown. However, as discussed above, the ALJ
17  did not give valid reasons for rejecting Dr. Brown's opinions, and so remand is proper here.
18  II.      <u>The ALJ's Assessment of Plaintiff's Credibility</u>
19        Questions of credibility are solely within the control of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d
20  639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. <u>Allen</u>, 749
21  F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is
22  based on contradictory or ambiguous evidence. <u>Id.</u> at 579. That some of the reasons for discrediting a
23  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as
24  long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148
25  (9th Cir. 2001).
26        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for
27  the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must
28  identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>;

Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Here, the ALJ discounted plaintiff's credibility for the following reasons:

> The claimant alleges that she has severe mood swings and that she is not reliable or able to complete tasks, but the treatment notes from her counselor and nurse practitioner do not indicate this level of dysfunction. These notes show that the claimant has responded to medication. She is able to make appointments. She does some work singing and for her father. She is able to run an open microphone night. While she and her witnesses report that she has problems getting along with people, she has managed to maintain a relationship with her trio for a few years. She is also able to deal with people in her singing.

Tr. 21. Plaintiff argues that these are not clear and convincing reasons for rejecting her testimony. While the undersigned finds that not all of these reasons are invalid, the substantial evidence in the record does not support the ALJ's credibility determination here.

As noted above, the ALJ first stated that mental health treatment notes in the record failed to indicate plaintiff had severe mood swings. The evidence regarding the frequency and severity of plaintiff's mood swings, however, is more mixed, at least until late March 2006. In early April 2005, for example, plaintiff reported "symptoms consistent with both depressive and manic episodes." Tr. 325. In late April 2005, Ms. Poole commented that plaintiff had described "clear episodes of hypomania," though she was "currently in a depressive phase." Tr. 320. In late May 2005, Ms. Poole stated that plaintiff's mood was "significantly improved," but also noted that she had been "cycling about every two or three days." Tr. 317. In late July 2005, while plaintiff reported less extreme cycles, she stated that they were becoming more rapid. Tr. 244. In mid-September 2005, plaintiff acknowledged having "some minimal but ongoing mood instability." Tr. 215. In late March 2006, however, Ms. Poole stated that plaintiff's depression was "often immobilizing." Tr. 211. Thus, it is not clear that treatment notes fail to support

REPORT AND RECOMMENDATION
Page - 11

plaintiff's claims here.

The undersigned does agree that the mental health treatment notes fail to support plaintiff's claims that she is not reliable or unable to complete tasks. As discussed above, however, the medical and other evidence in the record does contain at least some support for those claims, and, indeed, the ALJ erred in rejecting Dr. Brown's findings on that basis. Thus, this reason too is not clear and convincing. For the same reasons, the ALJ erred in discounting plaintiff's credibility on the basis that plaintiff could make appointments, did some work singing and for her father, was able to run an open microphone night, had managed to maintain a relationship with her trio for a few years, and was able to deal with people in her singing. The record does not clearly show that plaintiff's work activity and social functioning belie her claims of significant limitations in the ability to interact with other people.

On the other hand, also as discussed above, the weight of the evidence in the record establishes that plaintiff has responded well to and seen significant improvement in her mental health condition as a result of her medication regime. See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis medical improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). This, therefore, was a clear and convincing reason for discounting her credibility. However, given that it was the only valid reason provided by the ALJ, the undersigned finds that overall the ALJ's credibility determination is not supported by substantial evidence in the record. See Tonapetyan, 242 F.3d at 1148. Nevertheless, this last reason for discounting plaintiff's credibility, along with the issues regarding the medical evidence in the record noted above, indicate that remand for further administrative proceedings again is appropriate in this matter.

III. <u>The ALJ's Evaluation of the Lay Witness Evidence in the Record</u>

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

As discussed above, plaintiff's mother and friend both gave statements regarding their observations of plaintiff and her social functioning and other mental health limitations. The ALJ rejected the limitations they observed for the following reasons:

> The claimant's mother has indicated that the claimant ahs [sic] had significant problems since she was 21 years old, but the claimant has been able to sustain work activity since then. I have considered the lay statements from the claimant's mother and friend. While they certainly document that the claimant has some significant problems, they also document that the claimant has been able to sustain relationships and that, even though her symptoms have been present for years, she has been able to work. The indications are that the claimant should not be asked to do tasks on her own and independently of any supervision, but that she is able to stay on tasks for a couple of hours at a time. She may not be able to work closely with the general public, but she is able to operate an open microphone night and sing in public. She is also able to do her own shopping and get around as she needs to.

Tr. 22. Plaintiff argues that none of the sporadic activities cited by the ALJ undermine the limitations her mother and friend identified. Again, the undersigned agrees. As discussed above, while the record does show work activity by plaintiff, her own testimony and reports and the reports of her mother and friend also indicate plaintiff had significant issues with consistency and reliability.

The ALJ posits that plaintiff should be able to stay on tasks for a couple of hours. While plaintiff's mother did report that she could concentrate and accomplish tasks with good speed "for a few hours," she could only do so only if she had someone she liked working with her and encouraging her, and she did not seem to be able to sustain that same effort day after day. Tr. 110. In addition, as noted above, plaintiff appeared to have trouble following through with tasks while working both for her father and her friend. The ALJ's reliance on plaintiff's ability to operate an open microphone night and sing in public also is misplaced, as again there is a good amount of evidence in the record indicating that plaintiff engaged in these activities fairly sporadically due to her mental health issues, and that she did so with the assistance of others she knew. Finally, although plaintiff might be able to shop and get around, there is no indication that she has significant interpersonal interaction with other people at those times.

IV.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, as noted above, the ALJ assessed plaintiff with the residual functional capacity to "perform simple, routine tasks with only occasional public contact." Tr. 20.  Plaintiff argues this assessment should be overturned due to four errors committed by the ALJ.  First, plaintiff asserts the ALJ failed to discuss specifically her ability to work on a "regular and continuing basis" for eight hours a day, five days a week as required by the Commissioner's rulings.  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing basis**," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 *2 (emphasis in original).  The RFC assessment "must include a discussion of the individual's abilities on that basis." Id. (emphasis added).

Citing to two Fifth Circuit cases, Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2003), and Perez v. Barnhart, 415 F.3d 457 (5th Cir. 2005), defendant argues the ALJ need not make a specific finding as to a claimant's ability to sustain employment, but rather such a finding may be subsumed within the residual functional capacity assessment itself.  In Frank, because nothing in the record suggested that the claimant was unable to work on a sustained basis, the ALJ was not required to make an express determination as to whether work could be maintained on such a basis. 326 F.3d at 621.  The Fifth Circuit accordingly rejected the claimant's argument that separate findings must be made "on 'obtaining' and 'maintaining' a job in every case, even cases in which the applicant does not suggest that there is any difference between the

REPORT AND RECOMMENDATION
Page - 14

issue of his ability to work and his ability to sustain work." Id.; see also Perez, 415 F.3d at 466 (claimant failed to offer any evidence that his condition waxed and waned in intensity such that his ability to maintain work was not adequately taken into account in his RFC determination).

Adopting the approach taken by the Fifth Circuit in Frank and Perez, the undersigned finds that in this case the ALJ should have determined whether or not plaintiff was capable of working on a regular and continuing basis. This is because there is medical and other evidence in the record that plaintiff may not be able to perform full-time work – or work performed for eight hours a day, for five days a week – and thus this issue should have been addressed. That is, as discussed above, Dr. Brown found plaintiff would have significant difficulties in responding appropriately to and tolerating the pressures and expectations of a normal work setting, thereby calling into question her ability to maintain full-time employment. Dr. Kelly also found plaintiff to be significantly limited in her ability to perform work activities consistently, to deal with stress and to complete a normal workday or workweek. While the ALJ did not err in discounting Dr. Kelly's opinion, as discussed above, remand for further consideration of the opinions of both examining medical sources is needed. Lastly, the statements of plaintiff's mother and friend, which were not validly rejected by the ALJ, noted problems with her consistency and reliability.

Second, plaintiff argues the ALJ erred by not assessing her reaction to stress pursuant to SSR 85-15, 1985 WL 56857, even though Dr. Brown and Dr. Kelly both found her to be unable to deal with work stress or pressures. The undersigned, however, finds no error on the part of the ALJ here, because SSR 85-15 is applicable only to the issue of whether a claimant is capable of performing other work at step five of the sequential disability evaluation process, and the ALJ found plaintiff to be disabled at step four in this case. That is, if a claimant is found to be disabled or not disabled at any particular step of that evaluation process, the disability determination is made at that step, and the process ends. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If, though, on remand plaintiff is determined to be incapable of returning to her past relevant work, the Commissioner shall consider the effects, if any, of her ability, or lack thereof, to handle work-related stress or the pressures thereof.

Third, plaintiff argues the ALJ erred in assessing her residual functional capacity, because he did not properly consider all of the medical evidence in the record. Specifically, plaintiff asserts the ALJ erred in rejecting the opinions of Dr. Brown and Dr. Kelly. The undersigned agrees the ALJ's evaluation of the

REPORT AND RECOMMENDATION
Page - 15

medical evidence in the record, as discussed above, was not proper, and thus remand for re-consideration thereof is appropriate. That is, although the ALJ provided clear and convincing reasons for rejecting Dr. Kelly's opinion, he did not do so with respect to Dr. Brown. In addition, remand was appropriate in light of the ALJ's proper evaluation of the opinion of Dr. Kelly, because it called into question the credibility of the work-related limitations found by Dr. Brown. Given the uncertainties surrounding this evidence, it is not clear the ALJ's assessment of plaintiff's RFC is complete, and therefore remand for re-consideration at this stage of the sequential disability evaluation process is appropriate as well.

Plaintiff also argues the ALJ's assessment of her residual functional capacity is erroneous because he did not consider the opinion of Ms. Poole that her borderline personality disorder "probably" interfered with her ability to maintain employment. Tr. 211. As discussed above, though, this opinion was provided prior to subsequent treatment notes, in which Ms. Poole and other mental health treatment providers noted significant improvement on her medication regime. As such, it is not at all clear the ALJ would have been required to adopt Ms. Poole's opinion here. Nevertheless, her opinion does constitute significant probative evidence that the ALJ should have considered, but which it is not clear he properly did so. Accordingly, on remand the Commissioner shall make sure to consider this evidence as well.

Fourth, and last, plaintiff argues that although the ALJ appears to have accepted the findings of the medical expert who testified at the hearing that she had moderate limitations in social functioning and with respect to concentration, persistence and pace, he failed to incorporate those findings into his assessment of her residual functional capacity. Tr. 29. In addition, plaintiff contends the ALJ ignored the many moderate limitations in social functioning found by Thomas Clifford, Ph.D., and Janet Lewis, Ph.d., two non-examining physicians, in early January 2005. Tr. 364-80. In regard to the medical expert, while the ALJ did mention his findings (Tr. 19), nowhere in his decision did he actually indicate he was adopting them. As such, however, it is uncertain what weight the ALJ placed on the medical expert's testimony, another issue which should be visited on remand. The undersigned does agree, though, that the ALJ erred in failing to discuss what weight, if any, he was giving to the moderate limitations found by Drs. Clifford and Lewis. This the ALJ should have done, and his failure to do so was improper.

V.     The ALJ's Step Four Findings

Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to

return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). Here, as noted above, the ALJ found plaintiff capable of returning to her past relevant work as a library page, because it did "not require the performance of work-related activities precluded by" her residual functional capacity. Tr. 22. Plaintiff argues that because the hypothetical question the ALJ posed to the vocational expert at the hearing was not based on a complete RFC assessment, and because the ALJ based his determination at step four on the vocational expert's testimony, that determination was erroneous.

Defendant argues that the ALJ did not just rely on the vocational expert's testimony, but also found that she had given up that job voluntarily in 2003, not because of any impairment, but because she wanted to go into business with some friends. As such, defendant asserts, it was reasonable for the ALJ to assume plaintiff was capable of returning to her work at that time. The undersigned disagrees. The ALJ's findings at step four read as follows:

> The claimant testified that she was able to do this job and she did this work for three years. While she did have a hospitalization at the end of this job, that was related more to the stress of trying to purchase a new business and ending her job at the library rather than an inability to do the work at the library. The vocational expert testified that this job is unskilled in nature. While the claimant has indicated that she has frequent absences, she has not recently been trying work that does not involve more than simple, unskilled tasks and limited contact with the public. This type of work should reduce the level of stress she feels so that she could sustain this level of work on a regular and continuing basis.
>
> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as it is performed in the national economy.

Tr. 22-23.

Here, the ALJ relied at least in part on the vocational expert's testimony regarding the nature of the work involved in performing the job of library page. Given that the vocational expert's testimony was in response to the ALJ's hypothetical question which contained limitations substantially similar to those the ALJ included in his assessment of plaintiff's RFC (Tr. 65-67), to the extent the ALJ erred in making that assessment as discussed above, the vocational expert's testimony also cannot be considered to be reliable. Accordingly, since the ALJ relied on that testimony to at least some extent in finding plaintiff capable of returning to her past relevant work, the ALJ's step four findings are unreliable as well. Further, although plaintiff may have performed the library job for three years, and may have quit it for the purpose of going into business with her friends, this does not mean she necessarily can do that job now, particularly in light

of the medical and other evidence in the record obtained since that time. In addition, the fact that plaintiff was hospitalized – though perhaps not because of an inability to do that job at the time – indicates she did have significant mental health issues, and, indeed, as discussed above, consistency and reliability appear to have been significant problems for her as well during that period.

VI. This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical evidence in the record, plaintiff's credibility, the lay witness evidence in the record, plaintiff's residual functional capacity, and her ability to return to her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings. If, on remand, plaintiff is determined to be incapable of returning to her past relevant work, the Commissioner also should determine if she is able to perform other work existing in significant numbers in the national economy at step five of the sequential disability evaluation process.

It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). Further, "[i]n cases

1 where the vocational expert has failed to address a claimant's limitations as established by improperly
2 discredited evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than
3 payment of benefits." Bunnell, 336 F.3d at 1116.

4 It also is true that the Ninth Circuit has held that remand for an award of benefits is required where
5 the ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from
6 the record that the ALJ would be required to determine the claimant disabled if he had credited the
7 claimant's testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003). The Court of Appeals in
8 Connett went on to state, however, that it was "not convinced" the "crediting as true" rule was mandatory.
9 Id. Thus, at least where, such as here, findings are insufficient as to whether a claimant's testimony should
10 be "credited as true," it appears that the courts "have some flexibility in applying" that rule. Id.; but see
11 Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its
12 contrary holding in Connett).[3]

13 Finally, where lay witness evidence is improperly rejected, that testimony may be credited as a
14 matter of law as well. See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding that when lay
15 evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's
16 limitations were sufficient to meet or equal listed impairment). As noted above, however, the courts do
17 have "some flexibility" in how they apply the "credit as true" rule. Connett, 340 F.3d at 876. Further,
18 Schneider dealt with the situation where the Commissioner failed to cite any evidence to contradict the
19 statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976. Therefore, remand
20 for further proceedings, rather than an outright award of benefits, is proper here. Plaintiff requests that the
21 Commissioner be ordered to remand this matter to a different ALJ. However, plaintiff has not stated why
22 she believes this is necessary, nor does the undersigned find it to be so.

## CONCLUSION

24 Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff
25 was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

---

[3] In Benecke, the Ninth Circuit found the ALJ not only erred in discounting the claimant's credibility, but also with respect to the evaluations of her treating physicians. Benecke, 379 F.3d at 594. The Court of Appeals credited both the claimant's testimony and her physicians' evaluations as true. Id. It also was clear in that case that remand for further administrative proceedings would serve no useful purpose and that the claimant's entitlement to disability benefits was established. Id. at 595-96.

further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **October 17, 2008**, as noted in the caption.

DATED this 19th day of September, 2008.

*/s/ Karen L. Strombom*
Karen L. Strombom
United States Magistrate Judge